# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**SHANNON STEEDE,**

   **Plaintiff,**
**Intervenor Defendant,**
**Counter Defendant**,

  v.

**FREIGHT LOGIC, INC.,**    **Case No. 25-2136-DDC-TJJ**

   **Intervenor Plaintiff**,

  v.

**MIKE LEVY and DAVID BURDICK**,

   **Defendants,**
**Counter Claimants**.

## MEMORANDUM AND ORDER

  This case is back for round two. On April 7, 2025, the court denied pro se[1] plaintiff Shannon Steede's first Motion for a Temporary Restraining Order (TRO) (Doc. 7). Doc. 49. Now, the parties are back and, collectively, they pursue three more TRO and preliminary injunction (PI) motions, one filed by defendants, one filed by intervenor plaintiff, and one—a renewed motion—filed by plaintiff. Because the current motions turn on many of the same facts as plaintiff's first motion, the court recaps round one in some detail, below.

---

[1] Plaintiff proceeds pro se, so the court construes his pleadings liberally. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that courts must construe pro se litigant's pleadings liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers). But the court does not assume the role as plaintiff's advocate. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). And our Circuit "has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants." *Id.* (citation and internal quotation marks omitted).

In his part one TRO motion, plaintiff sought immediate relief after defendants Mike Levy and David Burdick removed plaintiff from his position as Chief Technical Officer (CTO) of Freight Logic, Inc.  Defendant Levy serves as Freight Logic's Chief Operating Officer and defendant Burdick serves as its President.  Plaintiff's first motion primarily requested reinstatement as CTO.  Doc. 7 at 3.  He argued that he "was unlawfully removed without a proper shareholder vote[.]"  *Id.* at 1.  But he also asked for various other forms of relief—that the court install him as CEO, for example, and freeze the corporate assets while allowing plaintiff to maintain full control over all aspects of Freight Logic's financial operations.  *Id.* at 3–4.

The court denied plaintiff's initial TRO motion on two independently sufficient bases.  *First*, plaintiff failed to show a likelihood of success on the merits.  He premised his CTO reinstatement request on his position as a shareholder.  *Id.* at 3.  But the evidentiary hearing revealed that plaintiff never contributed the $100,000 cash required by the parties' agreement to become a shareholder.  *See* Doc. 49 at 6–7.  And plaintiff's other requests—which would have altered the status quo, thus requiring an enhanced showing of success on the merits—also faltered.  Plaintiff's evidence simply failed to supply the requisite enhanced showing.  *See id.* at 7–11.  *Second*, the court held that plaintiff's motion had failed to demonstrate the irreparable harm required to warrant a TRO.  *Id.* at 13.  The harms plaintiff recited either were compensable with monetary damages or threatened the corporation—Freight Logic—not plaintiff.  *See id.* at 11–13.

Now for round two.  Plaintiff renews his request for a temporary restraining order and preliminary injunction.  Doc. 77.  In so doing, he purports to present "new and material evidence" uncovered "[s]ince the [c]ourt's prior denial" that "justifies emergency injunctive relief."  *Id.* at 1.  Even if this supplemental evidence could support a likelihood of success on the

merits, however, none of it alters the court's irreparable harm analysis. Plaintiff still hasn't shown any harms to himself that money damages wouldn't redress. So, the court denies plaintiff's renewed motion, as well.

Defendants Levy and Burdick also filed a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 58). But their motion suffers from a similar shortcoming. That is, they primarily premise their motion on damages incurred by Freight Logic, not themselves as individuals. The court thus denies the individual defendants' motion as well.

Finally, intervenor plaintiff Freight Logic filed the third current Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 27). Freight Logic's motion fares better than the other two on the irreparable harm front. Freight Logic alleges injuries to its goodwill— a form of harm our court routinely considers irreparable. But, in the end, the court denies Freight Logic's motion, too. Freight Logic fails to shoulder its burden, as the movant, to demonstrate substantial likelihood of success on the merits of any of its three causes of action: conversion, breach of fiduciary duty, and tortious interference.

The court held a hearing on plaintiff's initial TRO motion on March 31, 2025, in which plaintiff and defendants Levy and Burdick participated. On April 29, 2025, the court held another TRO hearing, in which all parties participated. This Order thus issues after all parties have engaged in at least one hearing, produced evidence, and argued their positions in multiple rounds of briefing. Given this ample opportunity to advocate, the parties stipulated to advancing the second TRO hearing to a preliminary injunction hearing. *See* 11A Charles A. Wright, et al. *Federal Practice and Procedure* § 2951 (3d. ed. April 2025 Update) ("When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for a preliminary injunction . . . . [A]nd,

3

if there is an adversary hearing . . . the 'temporary restraining order' may be treated as a preliminary injunction."); *see also Heavy Petroleum Partners, LLC v. Atkins*, No. 09-cv-01077-EFM-KMH, 2010 WL 11565423, at *3 (D. Kan. May 25, 2010) ("Because this order is entered not *ex parte*, but after an evidentiary hearing in which both parties participated, produced evidence, and had an opportunity to have their arguments heard, the Court concludes that it need not limit its order to a Temporary Restraining Order, but that the plaintiff is entitled to a preliminary injunction."); *3M Co. v. Rollit, LLC*, No. C 06-01225 JW, 2006 WL 8442072, at *2 (N.D. Cal. Apr. 5, 2006) ("The parties stipulated to advancing the hearing on the TRO to a hearing for a preliminary injunction.").

This Order thus decides all pending TRO and PI motions.

## I.    Background

The court recites the following facts from plaintiff's Amended Complaint (Doc. 6), exhibits attached to that Complaint, defendant Freight Logic's Intervenor Complaint (Doc. 26-1), the parties' representations at the two hearings, and evidence submitted by both parties in connection with these motions.

### *Pre-Incorporation Founders' Agreement*

On February 10, 2024, plaintiff and defendants Levy and Burdick signed a Pre-Incorporation Founders' Agreement to found Freight Logic. Doc. 6-4 at 11. Schedule B of that agreement outlined the founders' roles and responsibilities. *Id.* at 8–10. It assigned David Burdick the role of President, Michael S. Levy the role of Chief Operating Officer, and Shannon M. Steede the role of Chief Technology Officer. *Id.* at 8–9. The agreement provided that each founder "shall contribute" a specified sum "towards the expenses of the Startup[.]" *Id.* at 3. It set forth those initial capital contributions in Schedule D, with plaintiff's contribution described as follows: "$100,000 CASH contribution within one year of incorporation" to "be reinvested

4

into the company's operating budget." *Id.* at 10.  The bylaws likewise provided that stock issuance would follow plaintiff's contribution of "$100,000 by 2/1/25."  Doc. 6-2 at 3.  At the first hearing, defendants contended—and plaintiff confirmed—that plaintiff never paid this $100,000.

### *Transfer of Intellectual Property Provisions*

The Founders' Agreement also provided for transfer of each Founder's intellectual property rights.  Doc. 6-4 at 3–4.  Article 4 states that "each Founder shall grant and assign to the Corporation immediately upon its incorporation all of his or her right, title and interest in and to the Product or Service (including all right, title and interest to intellectual property)[.]"  *Id.*  The Agreement then provides that the transfer "shall be made pursuant to a customary confidentiality and intellectual property assignment agreement in favor of the Corporation."  *Id.* at 4.  Plaintiff contends this separate agreement never came to exist.  Defendants don't contest his assertion.

But the Founders' Agreement also requires each founder to "perform any and all acts and execute all documents . . . to perfect title in the Transfer . . . and any related intellectual property."  *Id.*  And it also specifies that "any discovery, invention, secret process or improvement in procedure made or discovered by any of the Founders . . . relating to the Produce or Service . . . shall belong to and be the absolute property of the Corporation immediately as of and following the Incorporation Date."  *Id.*  The language of the Founders' Agreement thus waffles between present transfer—accomplished by the Founders' Agreement—and contemplated future transfer—accomplished by a later document.  The parties therefore dispute whether the Founders' Agreement alone sufficed to transfer to Freight Logic any intellectual property plaintiff may have possessed at the outset.

### *Plaintiff's Removal*

On March 19, 2025, plaintiff received an email from defendant Mike Levy advising that plaintiff had "been removed from the Board of Directors of Freight Logic, Inc. . . . effective immediately." Doc. 6-3 at 1. The email noted plaintiff's failure to invest $100,000 by February 1, 2025, as well as plaintiff's allegedly "destructive behavior" and "disruptive actions" that "have placed Freight Logic, Inc. and its underlying technology in great peril." *Id.* Plaintiff alleges his removal was unlawful because it occurred "without a proper shareholder vote[.]" Doc. 6 at 1 (Am. Compl. ¶ I).

On the day of his removal, plaintiff withdrew $69,230.80 from Freight Logic's Chase Bank account and attempted to transfer it to his own bank account. Def. Ex. 808. Chase Bank froze the transferred money and, according to defendants' representations at the second hearing, since has returned the money to Freight Logic's account.

### *Plaintiff's Continued Control Over and Use of Freight Logic's Technology*

Despite his removal as CTO, plaintiff allegedly refuses to surrender control to various aspects of Freight Logic's technological systems. *First*, he won't turn over the "admin access" to Freight Logic's corporate email accounts and website. Doc. 58-1 at 5 (Levy Aff. ¶ 25). As a result, defendants Levy and Burdick can't make changes to the company website or fully access their email to fulfill their company duties. *Id.* at 6 (Levy Aff. ¶ 34). But plaintiff can. On April 4, 2025, plaintiff used his continued access to the Freight Lofic website to post on the "Latest News" page. *Id.* at 6 (Levy Aff. ¶ 29). His post described this lawsuit as a "Federal Lawsuit Filed Against Freight Logic Owners (Mike Levy and David Burdick) for Fraud and Mismanagement." *Id.* at 10 (Pl. Ex. 827). The posted news item went on to explain that a federal lawsuit filed against the owners alleged "fraudulent activity [and] financial misconduct[.]" *Id.*

*Second*, plaintiff continues to send emails from his corporate email address. *Id.* at 5 (Levy Aff. ¶ 25). On April 6, 2025, plaintiff used his Freight Logic email account to send an email titled "URGENT NOTICE TO INVESTORS, PARTNERS, AND STAKEHOLDERS." *Id.* at 13 (Def. Ex. 828). The email purported to convey "developments that may impact [the recipients'] investment, trust, and future dealings with Freight Logic Inc. and its current management." *Id.* And the email suggested that this lawsuit "could have long-term consequences, including potential operational suspension or dissolution of the business if governance concerns are not addressed." *Id.* at 15.

*Finally*, plaintiff refuses to surrender administrative access to an Amazon Web Services (AWS) account. Def. Ex. 826, 832. At the second TRO/PI hearing, defendants explained that they need plaintiff's credentials to access Freight Logic's AWS account—and pay the bill for that account. But plaintiff won't share the credentials needed to access and pay the AWS account. Plaintiff responded that the credentials would allow defendants to access not only Freight-Logic-related technological information and code, but also other code he personally had developed independently of Freight Logic and its business goals.

In addition to plaintiff's continued exercise of technological control, defendants contend plaintiff has communicated with clients and other entities in a fashion detrimental to Freight Logic. Specifically, defendants focus on plaintiff's contact with CANACAR—a client—and Grupo Cardinales—a Mexican entity with whom Freight Logic works. The court describes those communications, next.

### *Plaintiff's Contact with CANACAR*

On March 14, 2025, Freight Logic's joint venture—TalkFreight Mexico—signed an "Official Protocol Agreement of Collaboration" with CANACAR Manzanillo. Def. Ex. 822. At the first hearing, plaintiff identified CANACAR as the largest trucking organization in Mexico.

7

And he presented as evidence AI-generated charts of significant projected revenues that may follow from the CANACAR contract. *See* Pl. Ex. A6. He also alluded—during both hearings—to his own personal contact with CANACAR after Talk Freight Mexico entered that contract. Plaintiff explained that he had reached out to CANACAR through a chat platform to see if everything was "okay" because he hadn't received a copy of the signed contract. Defendants told the story of plaintiff's contact with CANACAR a bit differently. They explained that plaintiff spoke with the head of CANACAR on the phone in an aggressive manner. Indeed, according to defendants, plaintiff's aggressive approach led the head of CANACAR to contact the broker. CANACAR's head suggested to the broker that plaintiff's phone call had jeopardized the deal. When the court asked about the current status of the CANACAR contract, defendants explained that the company is taking steps to preserve that relationship but—at this point—it's "still dicey at best." Defendants also cited concerns about plaintiff's ongoing emails with Grupo Cardinales, as described, next.

### Plaintiff's Contact with Grupo Cardinales

Though the CANACAR contract references TalkFreight Mexico throughout, an entity named Grupo Carindales is the actual signatory on the March 14 contract—not Freight Logic or TalkFreight Mexico. At the second hearing, defendants described Grupo Cardinales as an entity who works with Freight Logic as part of the development of a process with CANACAR. And plaintiff described Grupo Cardinales as Freight Logic's Mexico division, run by Hector Mora.

On April 16, 2025, plaintiff sent a cease-and-desist email to Grupo Cardinales. Plaintiff's email demands that Grupo Cardinales "cease and desist from any unauthorized use" of what plaintiff calls "my intellectual property[.]" Doc. 92-2 at 1 (Def. Ex. 835). Plaintiff then defined his intellectual property as "the software I created and developed in August 2023, commonly known and referred to as the TalkFreight Software." *Id.* The email requires that Grupo

Cardinales "[p]rovide a detailed written response within seven (7) calendar days confirming your compliance with this demand[.]"  *Id.* at 1–2.  Finally, plaintiff warned Grupo Cardinales that its "failure to comply with this cease and desist notice may result in legal action[.]"  *Id.* at 2.

Plaintiff also wrote a follow-up letter.  That letter again identifies plaintiff's intellectual property as software he created in August 2023.  Doc. 92-1 at 1.  And it reiterates that Grupo Cardinales and its directors must "cease and desist any ongoing unauthorized activities, actions, or omissions related to [plaintiff's] intellectual property[.]"  *Id.*  It then notes their failure to respond to his previous communication.  *Id.*  And the letter threatens that their "continued silence, non-cooperation, and potential misuse" of plaintiff's intellectual property "may constitute aiding improper or unlawful actions[.]"  *Id.*  The letter finishes with a final warning: "Failure to comply promptly and fully with these requests may result in legal action being taken against Grupo Cardinales and its directors individually for damages, injunctive relief, attorneys' fees, and other remedies available under law."  *Id.*

Having recited the relevant background facts, the court's Order addresses the parties' many disputes in this sequence.  *First*, the court outlines the legal standard for a TRO and preliminary injunction.  *Then*, the court assesses the three pending motions under the irreparable harm prong of that legal standard.  Finding plaintiff's and the individual defendants' motions don't satisfy the irreparable harm prong, the court proceeds to the likelihood of success on the merits prong and assesses Freight Logic's motion alone.  Concluding Freight Logic fails to shoulder its burden under that second prong, the court needn't reach the third and fourth prongs. *Finally*, the court recites its conclusions.

## II.    Legal Standard

"Except as to notice and duration, the legal standards governing a temporary restraining order and a preliminary injunction are the same."  *Terrell v. Munk*, No. 25-3003-JWL, 2025 WL

548425, at *1 (D. Kan. Feb. 19, 2025) (quotation cleaned up).  A party seeking either a TRO or a preliminary injunction must show:  (1) that it is substantially likely to succeed on the merits; (2) that it will suffer irreparable injury if the court denies the requested relief; (3) that its threatened injury without the restraining order outweighs the opposing party's injury under the restraining order; and (4) that the requested relief is not adverse to the public interest.  *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019).

Preliminary relief—whether in the form of a TRO or a preliminary injunction—"is an extraordinary remedy, the exception rather than the rule."  *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (preliminary injunction); *see also Atkins*, 2010 WL 11565423, at *2 ("A temporary restraining order is an extraordinary remedy that is an exception rather than the rule, and courts do not grant it as a matter of right.").  The decision whether to issue "a temporary restraining order or other preliminary injunctive relief is within the sound discretion of the district court."  *Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 906 (D. Kan. 1995).

A plaintiff must make a "clear and unequivocal showing" on all four requirements for preliminary relief.  *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (quotation cleaned up).  But the first two requirements—likelihood of success on the merits and irreparable harm—"are the most critical."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Indeed, "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction[.]"  *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017).  Finally, when "the failure to satisfy one factor is dispositive, a court need not consider the other factors" for preliminary relief.  *Colorado*, 989 F.3d at 890 (declining to consider the remaining factors where plaintiffs failed to show irreparable harm).

Given the primacy of an irreparable harm showing, the court focuses its analysis of the three motions on the irreparable harm requirement first.  Only Freight Logic's motion survives.

### III.    Irreparable Harm

To merit preliminary injunctive relief, a party must establish that it will suffer irreparable injury if the court denies the requested relief.  *Mrs. Fields Franchising*, 941 F.3d at 1232. Proving irreparable harm is not "'an easy burden to fulfill.'"  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  "To constitute irreparable harm, an injury must be certain, great, actual, 'and not theoretical.'"  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  "Irreparable harm is not harm that is merely serious or substantial."  *Id.* (citations and internal quotation marks omitted).

Irreparable harm "is often suffered when 'the injury cannot be adequately atoned for in money,' or when 'the district court cannot remedy the injury following a final determination on the merits.'"  *Keller N. Am., Inc. v. Berkel & Co. Contractors, Inc.*, No. 24-2477-JAR-BGS, 2025 WL 918182, at *8 (D. Kan. Mar. 26, 2025) (brackets omitted) (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).  That is, our Circuit considers it "well settled that simple economic loss usually does not, in and of itself constitute irreparable harm" because "such losses are compensable by monetary damages."  *Heideman*, 348 F.3d at 1189.  And so, a party seeking interim relief establishes irreparable harm by demonstrating "'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone*, 321 F.3d at 1258).  Harms found to fit within this irreparable category include "loss of customers, loss of goodwill, and further erosion

of [a company's] competitive position" because of the difficulty in calculating such harms "in monetary terms." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1271 (10th Cir. 2018); *see also Dominion Video Satellite*, 356 F.3d at 1263 (collecting cases and identifying factors supporting irreparable harm to include "inability to calculate damages, harm to goodwill," and "lost opportunities to distribute unique products").

The court now applies this irreparable harm standard to all three pending motions, below, starting with plaintiff's renewed motion.

### A.    Plaintiff's Renewed TRO and PI Motion (Doc. 77)

In its Order (Doc. 49) on plaintiff's initial TRO motion (Doc. 7), the court held that plaintiff hadn't demonstrated the requisite irreparable harm for two reasons. The harms plaintiff recited either, *one*, were compensable at a later date by monetary damages or, *two*, threatened the corporation—Freight Logic—not plaintiff. *See* Doc. 49 at 11–13. None of the supplemental evidence in plaintiff's renewed motion alters the court's irreparable harm analysis. Plaintiff still hasn't shown any harms to himself that later-awarded money damages can't address. So, the court denies plaintiff's renewed motion (Doc. 77). And, because the parties agreed to advance the TRO hearing to a hearing for a preliminary injunction, the court also rules both of plaintiff's pending PI motions (Doc. 7; Doc. 77). Concluding plaintiff fails to meet the irreparable harm standard, the court denies both motions.

### B.    Defendants Levy and Burdick's TRO and PI Motion (Doc. 58)

Defendants Levy and Burdick's TRO and PI motion (Doc. 58) suffers a similar infirmity. The harms they invoke are harms to Freight Logic, not its individual officers or shareholders. To be sure, defendants bring a Counterclaim premised on reputational injuries to themselves as individuals. Doc. 57 at 30 (outlining the harms incurred from plaintiff's allegedly libelous communications which "are replete with false information and half-truths tending to expose [the

12

individual defendants] to public contempt or ridicule and deprive them of public confidence and social acceptance" resulting "in injury and harm to the reputation of [the individual defendants]"). But Levy and Burdick's motion never invokes these individual injuries to support emergency relief. *See* generally Doc. 58. And their reply brief only mentions, in passing harms to Levy and Burdick's reputations. *See* Doc. 92 at 9 (identifying that plaintiff added links describing this lawsuit to Levy and Burdick's bio pages on the Freight Logic website). These alleged reputational harms received the same perfunctory treatment at the second hearing. And other courts have found similar showings of unfavorable press insufficient to support preliminary injunctive relief. *See, e.g.*, *Burton v. Ariz. Dep't of Pub. Safety*, No. CV-20-00920-PHX-JAT (JZB), 2021 WL 1597893, at *6 (D. Ariz. Apr. 23, 2021) ("At most, . . . potential future . . . investors, or other business interests may . . . locate the press release . . . and thereby be dissuaded from engaging in business with [plaintiffs]. But this supposition is merely speculative, and speculative injury is insufficient to support the extraordinary remedy of preliminary injunctive relief."). So, the court concludes any drive-by argument of individual reputational harm doesn't suffice to warrant preliminary injunctive relief.

Alternatively—and in more fulsome fashion—the motion characterizes the irreparable harm as "a loss of goodwill, loss of customers and threats to business viability." Doc. 58 at 15. Frequently, the motion connects those harms just to Freight Logic—the corporation. *See id.* ("[Plaintiff's] current actions and likely future actions will reduce the value of goodwill of Freight Logic . . . [and] cause irreparable harm to the corporation's goodwill and customer relations."). But occasionally, the motion strives to loop in harms to shareholders by characterizing the loss of goodwill as a threat to their investment or ownership interests. *See id.* at 12 (explaining that plaintiff's actions "jeopardize the investments of the shareholders and the

goodwill of the corporation and pose[] a threat to the corporation's continued existence."); *id.* at 16 ("A legal remedy for monetary relief alone will not adequately protect Defendants' ownership interests or restore the goodwill of the corporation.").  Irreparable harm to the corporation and its goodwill, however, doesn't translate into irreparable harm to the individual defendants in their capacity as shareholders.

Our Circuit—in the standing context—has distinguished injuries to a corporation from injuries to shareholders.  For example, in *Bixler v. Foster*, the Circuit clarified that "a diminution in value of [shareholders'] corporate shares" is "an injury to the corporation"—not its shareholders.  596 F.3d 751, 757 (10th Cir. 2010); *see also Orr v. Husch Blackwell, LLP*, 718 F. App'x 759, 760 (10th Cir. 2018) (explaining under Kansas law that a "shareholder may only litigate as an individual" by showing "he has suffered an injury that is not dependent on an injury to the corporation." (quotation cleaned up)).  Here, the harm to goodwill that Levy and Burdick summon trying to support their TRO and PI motion is a harm to the corporation.  Any purportedly individual harm stemming from that loss of goodwill—including threats to shareholder investments and ownership interests—depend on an injury to Freight Logic.  And so, the court concludes, Levy and Burdick fail to demonstrate any irreparable harm to themselves as individuals—distinct from harm to the corporation.  And the court thus denies their motion for failure to establish individual irreparable harm.  But Freight Logic's motion is another matter.

### C.    Defendant Freight Logic's TRO and PI Motion (Doc. 27)

Freight Logic asks the court to order plaintiff to transfer and release control of its website and Freight Logic employee email accounts.[2]  Doc. 27 at 1.  It cites the risk that plaintiff "may

---

[2]       In its original filing, Freight Logic also asked the court to freeze plaintiff's assets "until he has repaid Freight Logic for the money [$69,230.80] he referred to himself" from Freight Logic's Chase Bank account after his termination.  Doc. 27 at 1, 3.  And it asked the court to impose a constructive trust for those allegedly converted funds.  *Id.* at 5.  But at the second hearing, defendants represented to the court

reduce the value of goodwill of Freight Logic" apart from that relief. *Id.* at 8. Courts have defined good will as "'the expectancy of continued patronage.'" *Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC*, No. CV 17-0981 JB/JHR, 2018 WL 2604831, at *17 (D.N.M. June 2, 2018) (quoting *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993)). Another working definition is "the value inhering in the way in which one's business is viewed in the community." *Marrero v. City of Hialeah*, 625 F.2d 499, 516 n.22 (5th Cir. 1980). Perhaps the most storied definition of goodwill dates back to Justice Story, who described it, in part, as the "benefit which is acquired by an establishment . . . on account of its local position, or common celebrity, or reputation for skill[.]" *Metro. Nat'l Bank v. St. Louis Dispatch Co.*, 149 U.S. 436, 446 (1893) (citation omitted).

The evidence indicates that plaintiff has engaged in behavior putting Freight Logic at significant risk of losing goodwill among clients and investors. Plaintiff's April 4, 2025, post on Freight Logic's "Latest News" page likely communicated to clients that Freight Logic wasn't trustworthy. It accused defendants Levy and Burdick of "fraudulent activity [and] financial misconduct[.]" Doc. 58-1 at 10 (Def. Ex. 827). Plaintiff's continued access to (and control of) Freight Logic's webpage allows him to control the narrative of this lawsuit as it appears on company sources, thus denigrating the "way in which [Freight Logic] is viewed in the community." *Marrero*, 625 F.2d at 516 n.22. And allegations of fraud and financial misconduct appearing front-and-center on a company's latest news page imperils the "benefit" Freight Logic has acquired with clients based on its "reputation for skill" as a dependable company. *Metro. Nat'l Bank*, 149 U.S. at 446.

_____

that the bank had restored the money to Freight Logic's account. The court thus doesn't consider any harms from plaintiff's alleged conversion of funds in its irreparable harm analysis. It likewise doesn't take up these funds when discussing the likelihood of success on the merits of Freight Logic's conversion claim. *See* § IV.A.

Plaintiff's April 6, 2025, "URGENT NOTICE TO INVESTORS, PARTNERS, AND STAKEHOLDERS" email likewise has a potentially detrimental effect on Freight Logic's good will. It explicitly invites recipients to reconsider their "investment, trust, and future dealings with Freight Logic Inc. and its current management." Doc. 58-1 at 13 (Def. Ex. 828). And it warns that the present lawsuit "could have long-term consequences, including potential operational suspension or dissolution of the business if governance concerns are not addressed." *Id.* at 15. When such an email comes from a Freight Logic email address, it enshrouds it in legitimacy that it couldn't possess otherwise. Such interference with investors' confidence paves the way for an "erosion of [Freight Logic's] competitive position[.]" *DTC Energy*, 912 F.3d at 1271. Indeed, *DTC Energy* found it notable—in denying a company's preliminary injunction motion—that a former employee *didn't* retain access to the company email. *See* 912 F.3d at 1272.

Not only has plaintiff utilized his continued access to Freight Logic's website and email to undermine the company's goodwill, he also refuses to relinquish administrative access to those accounts. This inhibits defendants' ability to fulfill their obligations and control their reputation. The damage to Freight Logic's reputation because of this conduct satisfies the irreparable harm prong of the preliminary injunctive relief requirements. So, Freight Logic's motion is the lone survivor of the court's irreparable harm analysis. It alone thus passes on to the next prong of the analysis: likelihood of success on the merits.

## IV.     Likelihood of Success on the Merits

Freight Logic, as intervenor plaintiff, premises its TRO and PI requests on three claims: conversion, breach of fiduciary duty, and tortious interference with current and prospective

contractual relations.[3]  Doc. 26-1 at 10–11, 12–14 (Intervenor Compl. ¶¶ 53–61, 69–81).  On the current record, Freight Logic hasn't shown a substantial likelihood of success on the merits of any of these claims.  The court explains this conclusion in the context of each claim pressed by Freight Logic, below, starting with conversion.

### A.     Conversion

Freight Logic premises its conversion claim on plaintiff's allegedly unauthorized exercise of ownership over Freight Logic's website, corporate email accounts, and other technological assets (such as its AWS account).  And its motion contends that plaintiff "has no right to claim either possession or ownership of Freight Logic's . . . locked down assets."  Doc. 27 at 8.  The motion asserts that plaintiff exercises control over these technologies in such a way that he "exclude[s] Freight Logic from using or possessing them."  *Id.*

The court is sympathetic to Freight Logic's plight.  Plaintiff effectively has hijacked Freight Logic's website, email accounts, and technological assets.  Such conduct not only harms Freight Logic, but also jeopardizes any value plaintiff might derive from the company's assets if he eventually succeeds on his claims.  Plaintiff, in essence, shoots himself in the foot by making it more difficult for Freight Logic to function fully.  But here's the problem:  Freight Logic never identifies a single case from a Kansas[4] court to suggest that a conversion claim can encompass

---

[3]      The Intervenor Complaint asserts claims organized into six counts, all told.  But three of those counts—Count I (Injunctive Relief), Count III (Constructive Trust), and Count VI (Declaratory Judgment)—are requests for a specific remedy—not a separate cause of action.  *See Brickert v. Deutsche Bank Nat'l Tr. Co.*, 380 F. Supp. 3d 1127, 1141 (D. Colo. 2019) ("Plaintiff alleges a 'claim' for . . . injunctive relief, but such claim is actually a request for a certain type of relief and not a separate cause of action."); *Redmond v. Hassan*, 523 B.R. 729, 744 (D. Kan. 2014), ("A constructive trust is a remedy and not a cause of action."), *aff'd*, 606 F. App'x 471 (10th Cir. 2015); *Utah Hous. Corp. v. Country Pines, Ltd.*, 541 F. Supp. 3d 1288, 1295 n.1 (D. Utah 2021) ("[A] declaratory judgment is a remedy, not an independent cause of action.").  So, the court's "likelihood of success on the merits" analysis considers only the claims in the six counts which qualify as causes of action.

[4]      Neither party addresses which state's law applies.  In a diversity case like this one, the court applies the substantive law of the forum state, including its conflict-of-laws rules.  *Emps. Mut. Cas. Co. v.*

hijacked access to websites or emails. And the court's independent research didn't turn one up, either.

"In Kansas, conversion is defined as the 'unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.'" *Monarch Build, LLC v. DLH Holdings, LLC*, No. 126,930, 2025 WL 1087940, at *19 (Kan. Ct. App. Apr. 11, 2025) (published opinion) (quoting *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 378 P.3d 1090, 1095 (Kan. 2016)). "Intangible personal property, as well as tangible personal property, may be the subject of a claim for conversion. In order to be subject to a claim for conversion, however, the intangible property must be merged with tangible property capable of being converted, *i.e.,* a document." *Moeller v. Kain*, 192 P.3d 689, 2008 WL 4416042 at *5 (Kan. Ct. App. 2008) (citations omitted). For example, in *Moeller*, the Kansas Court of Appeals treated intangible "client accounts" as capable of supporting a conversion

---

*Bartile Roofs, Inc.*, 618 F.3d 1153, 1170 (10th Cir. 2010); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Applying Kansas's conflict of law rules, two doctrines suggest, at least preliminarily, that Kansas law should govern this tort claim.

*First*, Kansas follows the rule of *lex loci delicti*. It provides that "the law of the state where the tort occurred governs the merits of the litigation." *Anderson v. Com. Constr. Servs., Inc.*, 531 F.3d 1190, 1194 (10th Cir. 2008) (citing *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985)). The state where the tort occurred is "that place where the last event necessary to impose liability took place." *Wingerd v. Kaabooworks Servs., LLC*, No. 18-CV-2024-JAR-KGG, 2019 WL 1171700, at *19 (D. Kan. Mar. 13, 2019) (internal quotation marks and citation omitted). Courts also have described it as "the state in which the wrong was felt." *Delcavo v. Tour Res. Consultants, LLC*, No. 21-2137-JWL, 2021 WL 4453572, at *1 (D. Kan. Sept. 29, 2021). Here, the alleged wrongs are felt by Freight Logic, a Kansas corporation with its principal place of business in Johnson County, Kansas. *See* Doc. 26-1 at 1 (Intervenor Compl. ¶ 1). So, Kansas is "the state in which the wrong was felt." *Delcavo*, 2021 WL 4453572.

*Second*, "Kansas courts have often leaned toward a *lex fori*, or law of the forum, approach, opting to apply Kansas law absent a clear showing that another state's law should apply." *In re K.M.H.*, 169 P.3d 1025, 1032 (Kan. 2007). Neither party made a showing that another state's law should apply, much less a clear showing. So, either doctrine leads the court to Kansas law.

claim when the alleged conversion involved "the physical files, papers, and folders containing confidential personal and financial information regarding clients." *Id.*

Here, though, Freight Logic never identifies any way in which intangible access to its web page, email, or other technological assets has merged with tangible property. *See Jackie's Enters., Inc. v. Belleville*, 165 A.D.3d 1567, 1573 (N.Y. App. Div. 2018) (identifying web site as intangible item). That's not to say Freight Logic never could succeed on its conversion theory. After all, a novel interpretation of Kansas tort law—especially given the world's increasing shift from tangible to intangible property—doesn't necessarily doom Freight Logic's conversion claim. *See, e.g.*, *Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284, 1288 (D. Utah 2009) (finding that a claim for conversion was legally cognizable under Utah law when defendant made it physically impossible for plaintiff to access web pages at issue). But, at this preliminary stage—and with a request for relief that it is extraordinary—a legal theory never tested in Kansas courts undercuts Freight Logic's likelihood of success on the merits. *See E. Shoshone Tribe v. N. Arapaho Tribe*, 926 F. Supp. 1024, 1032 (D. Wyo. 1996) (concluding no substantial likelihood of success on the merits where "novel, untested [theory did] not provide any assurance of eventually prevailing on the merits"); *Sampson v. All Am. Home Assistance Servs., Inc.*, No. 13-CV-495-WSD, 2013 WL 12322089, at *10 (N.D. Ga. Mar. 7, 2013) ("Plaintiffs have not shown a substantial likelihood of success on the merits . . . where, as here, Plaintiffs rely on an unprecedented and novel interpretation[.]"). The court simply can't grant extraordinary injunctive relief on an untested theory of conversion under Kansas law. And the same fate befalls Freight Logic's breach of fiduciary duty claim, which the court addresses, next.

### B.    Breach of Fiduciary Duty

Freight Logic also alleges that plaintiff breached his fiduciary duty to Freight Logic by preventing Freight Logic's usage or access to "its websites, emails, and customer information[.]"

Doc. 26-1 at 13 (Intervenor Compl. ¶¶ 78–79).  Freight Logic contends that plaintiff owes Freight Logic a fiduciary duty because of plaintiff's "former status as CTO and member of the Board of Directors."  *Id.* (Intervenor Compl. ¶ 77).

To bring a successful breach of fiduciary duty claim, a party must establish "(1) the existence of a duty arising from a fiduciary relationship; (2) a breach of duty; and (3) an injury resulting proximately from the breach."  *Stroud v. Ozark Nat'l Life Ins. Co.*, 564 P.3d 725, 731–32 (Kan. 2025).  Kansas recognizes two types of fiduciary relationships:  "those created by contract and those implied in law from the surrounding facts and the relationship of the parties."  *Daniels v. Army Nat'l Bank*, 822 P.2d 39, 42 (Kan. 1991).  "Kansas imposes a very strict fiduciary duty on officers and directors of a corporation to act in the best interests of the corporation and its stockholders."  *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 146 (Kan. 2003) (internal quotation marks and citation omitted).  But that duty exists *when* those individuals serve as officers and directors.  That's not the premise of Freight Logic's fiduciary duty claim.

Here, Freight Logic's Intervenor Complaint premises its breach of fiduciary duty claim on access-to-technology issues.  *See* Doc. 26-1 at 13 (Intervenor Compl. ¶ 78).  The Complaint alleges the following conduct:  "Through the actions of [plaintiff], various items of value have been moved from Freight Logic or altered to prevent the usage or access by Freight Logic, including its websites, emails, and customer information which impact current and future business, projects and resources."  *Id.*  But Freight Logic confirmed at the second hearing that the alleged breaching conduct all occurred *after* defendants had fired plaintiff.  When asked to clarify its fiduciary duty theory, Freight Logic explained that plaintiff continues to hold himself out as CTO and, thus, his fiduciary duties to the company persist despite his termination.

The court commends counsel for thinking outside-the-box.  And perhaps the theory will develop legs.  But Freight Logic provides no authority—under Kansas law or otherwise—to support the proposition that plaintiff's holding himself out as a corporate officer imputes fiduciary duties to him *after* termination.  And the court has found no authority supporting such an ongoing duty under Kansas law.  Indeed, other states have reached the opposite result, concluding that a corporate officer's fiduciary duties terminate when his role terminates.  *See, e.g.*, *Bay Fasteners & Components, Inc. v. Factory Direct Logistics, LLC*, No. 17-CV-03995, 2018 WL 1394033, at *5 (N.D. Ill. Mar. 20, 2018) ("Generally, under Florida law, a fiduciary duty terminates upon the resignation of the officer or severance of the official relationship."); *Steinberg Moorad & Dunn, Inc. v. Dunn*, No. CV 01-07009 RSWL(RZX), 2002 WL 31968234, at *25 (C.D. Cal. Dec. 26, 2002) (same under California law); *Tech. for Energy Corp. v. Integrated Sys., Inc.*, 895 F.2d 1414, 1990 WL 14629, at *2 (6th Cir. 1990) (same under Tennessee law); *but see Jose Armando Bermudez & Co. v. Bermudez Int'l, Inc*., No. 99 CIV. 9346 (AGS), 2001 WL 1382582, at *4 (S.D.N.Y. Nov. 6, 2001) ("[U]nder New York law, an officer's fiduciary duties to a corporation may continue after the officer is terminated.").

To reiterate, preliminary injunctive relief doesn't follow from novel, unprecedented, and currently unsupported legal theories.  *See E. Shoshone Tribe*, 926 F. Supp. at 1032.  The court concludes defendants' theory of an ongoing duty after termination is novel under Kansas law.  So, the court declines to grant preliminary injunctive relief on the likelihood that such a novel theory will succeed.  That leaves one final claim:  tortious interference.  The court takes it up, below.

## C.    Interference with Current and Prospective Contractual Relations

"Kansas recognizes both tortious interference with contract and tortious interference with prospective business advantage or relationship."  *Ayres v. AG Processing Inc.*, 345 F. Supp. 2d

1200, 1210 (D. Kan. 2004) (citing *Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986)). "'While these torts tend to merge somewhat in the ordinary course, the former is aimed at preserving existing contracts and the latter at protecting future or potential contractual relations.'" *Cohen v. Battaglia*, 293 P.3d 752, 755 (Kan. 2013) (quoting *Turner*, 722 P.2d at 1115).

### 1.    Tortious Interference with Contract

Under Kansas law, the "elements essential to recovery for tortious interference with a contract are:  (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom." *Burcham*, 77 P.3d at 150 (citation and internal quotation marks omitted).  At the second hearing, Freight Logic clarified that its tortious interference with a contract claim relies on just one contract:  the newly formed contract with CANACAR, signed March 14, 2025.  *See* Def. Ex. 822.  The court begins its likelihood of success on the merits analysis with the first two tortious interference with a contract elements.

### a.    The first two elements:  contract and alleged wrongdoer's knowledge

At the first hearing, plaintiff attested to his knowledge of the contract's existence, presenting as evidence AI-generated charts of the projected revenues flowing from that contract. *See* Pl. Ex. A6.  And at the second hearing, Freight Logic placed the CANACAR contract into evidence.  Def. Ex. 822.  As simple as that, Freight Logic satisfies the first two elements for tortious interference with a contract under Kansas law—the contract itself and plaintiff's knowledge of it.  The third and fifth elements—intentional procurement of the contract's breach and resulting damages—prove more complicated, however.

      **b.**      **The third and fifth elements:  intentional procurement of contract's breach and resulting damages**

To support its tortious interference claim, Freight Logic identifies two contacts plaintiff made.  Both are troubling.  *First*, Freight Logic cites plaintiff's phone call with the head of CANACAR.  *Second*, it highlights plaintiff's email and follow-up letter to Grupo Cardinales.  But Freight Logic never identifies any breach—or any resulting damage—from either episode.  To be sure, Freight Logic asserted at the hearing that the head of CANACAR expressed reservations to the broker after plaintiff placed his phone call.  But, as best the court can tell, this phone call happened shortly after CANACAR signed the contract—in mid-to-late March 2025.  And now, more than a month later, Freight Logic can't identify any other hiccups or signs of reticence, much less an actual breach of the contract.

Nor does Freight Logic demonstrate any fallout from plaintiff's email and letter to Grupo Cardinales.  Freight Logic never provided any facts or evidence to suggest that Grupo Cardinales has pulled out—or even contemplated pulling out—of the CANACAR contract.  No contract destabilization—that could later lead to a breach—manifested itself at the evidentiary hearing.  Indeed, Freight Logic provided no insight into Grupo Cardinales's current perspective on the contract.  Without some showing of reasonably probable breach and damages, Freight Logic falls short of the "substantial likelihood" mark required to secure preliminary relief.  *See Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 1194 (D.N.M. 2020) ("A substantial likelihood is defined as a prima facie case showing a reasonable probability that the movant will ultimately be entitled to the relief sought." (quotation cleaned up)); *see also Marina Dist. Dev. Co. v. AC Ocean Walk, LLC*, No. 20-cv-01592-GMN-BNW, 2020 WL 5502160, at *6 (D. Nev. Sept. 10, 2020) (finding no likelihood of success on the merits of tortious interference claim, in part, because plaintiff never alleged damages).

Responding to the court's questions about breach and damages, Freight Logic contended that it needs preliminary injunctive relief to stop plaintiff's behavior so it won't experience direct economic loss in the future.  The court isn't persuaded.  Despite plaintiff's alleged interference, the CANACAR contract is a go, apparently.  Freight Logic hasn't presented any facts or identified evidence to suggest otherwise, beyond fear and speculation about future interference. But fear and speculation won't get the job done at the preliminary injunctive relief stage.  *See Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc*., 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003) ("A speculative injury or the mere possibility of harm will not suffice.").  Freight Logic, as the moving party, bears the burden "to clearly and unequivocally demonstrate the necessity of the requested preliminary injunctive relief."  *Biomin Am., Inc. v. Lesaffre Yeast Corp.*, No. 20-CV-02109-HLT, 2020 WL 1503475, at *5 (D. Kan. Mar. 30, 2020).  It hasn't shouldered that burden here.

On the current record, the court thus finds that Freight Logic hasn't met its burden of establishing a likelihood of success on the merits of its tortious interference with a contract claim.  Freight Logic failed to present any facts or evidence to support two of the five requisite elements.  And so, Freight Logic hasn't demonstrated a substantial likelihood of success on the merits of its tortious interference with a contract claim.  The court thus concludes—without needing to address the fourth tortious-interference-with-a-contract element—that Freight Logic hasn't shouldered its burden here.

A similar shortfall manifests with Freight Logic's tortious interference with prospective business advantage claim, which the court addresses, next.

### 2.  Tortious Interference with Prospective Business Advantage

Kansas law also provides for a tortious interference with a prospective business advantage claim, requiring the following elements:

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Smith v. Williams*, No. 23-3227, 2024 WL 5153996, at *4 (10th Cir. Dec. 18, 2024) (first citing *Turner*, 722 P.2d at 1115; and then citing *Brown v. Univ. of Kan.*, 16 F. Supp. 3d 1275, 1291 (D. Kan. 2014), *aff'd*, 599 F. App'x 833 (10th Cir. 2015)). Freight Logic also must prove plaintiff acted with malice. *Id.* (citing *Turner*, 722 P.2d at 1115).

The Intervenor Complaint alleges that plaintiff's "intentional misconduct to preclude or attempt to preclude customers from communicating with Freight Logic" has resulted in damages to Freight Logic. Doc. 26-1 at 13 (Intervenor Compl. ¶¶ 72–74). But—like with its other tortious interference claim—Freight Logic fails to specify any damages, the fifth element. Plus, other deficiencies plague this version of Freight Logic's tortious interference claim. Unlike its success pinpointing the CANACAR contract, above, Freight Logic here doesn't identify any particular relationship or business expectancy. And without such particularity, Freight Logic's ability to demonstrate that plaintiff had knowledge of the relationship or expectancy—the second element—also falters. Nor has Freight Logic demonstrated that plaintiff's conduct somehow severed any relationship or obstructed any expectancy, the third element. To be sure, Freight Logic supplied evidence that plaintiff sent a warning email to investors. Doc. 58-1 at 13–15 (Def. Ex. 828). But it never communicated any resulting relationship or expectancy consequences, or any damages suffered because of that email. Indeed, Freight Logic remained altogether silent on the issue of investor response. Freight Logic also provided screenshots of plaintiff's posting about this lawsuit on its webpage. *See* Doc. 58-4 at 3 (Def. Ex. 827); Doc. 92-3 at 1–4 (Def. Ex. 836). But again, there's no mention of any consequences for a business

relationship or expectancy.  And at the second hearing, Freight Logic made passing reference to a line of credit no longer available, but never presented any evidence or argument on that front. In the end, Freight Logic only shouldered its burden to establish the fourth prong—intentional misconduct by plaintiff.  And while that prong is crucial, it can't carry the day alone.  On the current record, Freight Logic hasn't shown by a likelihood that plaintiff's interference has stymied or thwarted any prospective business advantage.

In sum, Freight Logic hasn't met its burden—clearly and unequivocally—to establish the likelihood of success on the merits to justify the extraordinary relief that it seeks.  None of the three claims—at this stage and on this record—provide "a reasonable probability that the movant will ultimately be entitled to the relief sought." *Peterson*, 492 F. Supp. 3d at 1194 (quotation cleaned up).  The court thus denies Freight Logic's TRO and PI motion.  And, because this conclusion disposes of all pending motions for preliminary relief, the court needn't address the other two prongs of the TRO/PI legal standard.  *See Colorado*, 989 F.3d at 890.  So, the court's analysis ends here.

## V.    Conclusion

The court denies plaintiff's renewed TRO and PI motion (Doc. 77) and defendants Levy and Burdick's TRO and PI motion (Doc. 58) because these parties failed to establish the requisite irreparable harm required for extraordinary preliminary relief.  And the court denies the pending PI portion of plaintiff's initial TRO and PI motion (Doc. 7) on the same basis.  Finally, the court denies defendant Freight Logic's TRO and PI motion (Doc. 27), as well.  Freight Logic hasn't shouldered its burden to demonstrate a substantial likelihood of success on the merits of any of its three claims.

To be clear, Freight Logic has identified some troubling behavior on plaintiff's part.  And plaintiff would do well to change his ways—he is playing with fire.  If he interferes in a way that

causes a reasonably probable contractual breach or a more definitive threat to Freight Logic's prospective business advantage, Freight Logic may well finish the showing required for injunctive relief in a renewed motion. But at this juncture, the record before the court doesn't warrant preliminary injunctive relief.

Finally, the court perceives a likelihood that plaintiff's conduct is motivated by vengeance, a desire to secure revenge against the individuals who terminated his employment. Nor is the court persuaded by plaintiff's assertion that he's not trying to harm Freight Logic— he's trying instead to "save it." It's hard to imagine how calling Freight Logic's contract partner and accusing Freight Logic's current management of fraud will "save" Freight Logic. Harm seems far more likely. And as the court emphasized at the second hearing, taking revenge against his former business partners may destroy the value he, in theory, could use to satisfy any judgment he might secure.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff Shannon Steede's Motion for Preliminary Injunction (Doc. 7) is denied.

**IT IS FURTHER ORDERED THAT** defendant Freight Logic's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 27) is denied.

**IT IS FURTHER ORDERED THAT** defendants Mike Levy and David Burdick's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 58) is denied.

**IT IS FURTHER ORDERED THAT** plaintiff Shannon Steede's Renewed Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 77) is denied.

**IT IS SO ORDERED.**

Dated this 9th day of May, 2025, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge